## BETTS ET AL. *vs.* BETTS.

1. Where a father, having executed in favor of his daughter an instrument, which is ineffectual as a conveyance, but of which fact he is ignorant, immediately after her marriage delivers property to the husband under the impression and belief that such instrument secures it to her sole and separate use, and the husband accepts it with full notice and under a similar belief, a trust arises in behalf of the wife, which a court of equity will enforce.

2. Although a bill is multifarious and is demurred to for that cause, yet if the parties proceed to a hearing and the chancellor, without noticing the demurrer, renders a final decree on the merits upon one matter alone, this court will presume the other portion of the bill, on which the objection was founded, to have been waived and abandoned in the court below, and will not dismiss the bill on the ground of multifariousness.

3 An indebtedness accruing from a husband to his wife on account of her separate estate does not create a specific lien on his property, and cannot, therefore, be prefered in payment to debts due by him to third persons, who have acquired liens on such property by judgment and execution.

ERROR to the Chancery Court of Barbour. Tried before the Hon. J. W. Lesesne.

BELSER and COCKE, for the plaintiffs in error.

BUFORD, for the defendant.

DARGAN, C. J.—The material allegations of this bill may be thus stated: On the 29th of October 1827, Moses Walker, the father of complainant, executed an instrument in writing, which purports to convey to his sons, Josiah and Alexander Walker, all the property, both real and personal, that should come to or be vested in the complainant, (then the wife of Dr. Ambrose Nelson,) either as one of his distributees or legatees, to be held by them in trust for the sole and separate use of the complainant, during her natural life, free from the debts contracts or control of her then, or any future husband, with power in the complainant to will the same as she might see fit, whether sole or married, but in default of such disposition, then in trust for such children as the complainant should leave surviving her. It is also alleged that the complainant was divorced from Dr. Nelson, and some time in the year 1834, intermarried with Elisha Betts, her present husband; and that shortly after this marriage, Moses Walker delivered to Elisha Betts six slaves, one horse, and a hundred dollars in cash, under the belief, and with the intention, that said property would pass by the instrument and be held in conformity with its provisions, for the sole and separate use of the complainant, and that Elisha Betts so understood the gift. The bill further charges, that there was a mistake in drawing the instrument, in this, that it does not provide that the property which Moses Walker might give to the complainant during his life should be held by his sons, Josiah and Alexander, for the separate use of the complainant; that such was the design of the instrument, and such the instructions given to the attorney who drew it, but that this provision was omitted, owing to the haste with which it was drawn. It is further alleged, that Moses Walker executed the instrument under the belief that it would be effectual to secure to the complainant, not only any property she might receive from him at his death, but also such as he might give her during his life, and under this belief and impression he continued until his death.

The bill prays the correction of the instrument so as to conform to the intentions of the donor; that the property delivered to her husband by her father be decreed to be her separate estate; and that the creditors of her husband, who have caused the property to be levied on, be enjoined from selling it, and also for general relief.

The answer of Elisha Betts neither expressly admits nor denies the mistake in drawing the instrument, but insists that the object of it was to exclude the marital rights and control of Dr. Nelson, the husband of complainant at the time it was executed; and further, that the slaves named in the bill were given and delivered to him by Moses Walker as his own, and did not pass by virtue of the deed to the trustees, nor were they given in trust for the separate use of the complainant.

Gunn, who is an assignee of some of the judgments against Betts, has no knowledge of the instrument, but from information denies the mistake, and also that it was the intention of Moses Walker to give the property in such manner as to be held for the separate use of the complainant; and he insists that it was given unconditionally after the marriage to Elisha Betts, and is therefore subject to his debts.

The testimony, in my opinion, fully establishes that there was a mistake in drawing the deed. Mr. Schly states positively, that he was instructed to draw the instrument, so as to secure to the separate use of the complainant, during her natural life, not only such property as she should receive from her father's estate at his death, but also such as he might deliver to her during his life. The evidence of this witness is corroborated by all the testimony and all the circumstances that bear upon it, and the mistake is not denied by any one who has any knowledge of the transaction.

But the mistake in the instrument is not conclusive of the rights of the complainant, for nothing passed by its execution. At most it can be considered only as a declaration, that all the property the father of the complainant should afterwards give her, he would give to his two sons in trust for her sole and seperate use, during her life, free from the control of her then present or any future husband. This intention thus declared he could afterwards abandon, and if he gave her property upon different terms or conditions than those named in the instru-

ment, it is clear that the deed could have no influence upon it. Laying then the instrument aside as a conveyance of property, the material question is, upon what terms and conditions was the property delivered to Elisha Betts? The evidence fully satisfies me that Moses Walker, the donor, at the time of the delivery of the slaves to Betts, did not intend or believe that Betts would take any title or interest in them, but that they would pass under the supposed provisions of the deed to his two sons, as trustees, for the sole and separate use of the complainant during her natural life, and after her death to such of her children as should survive her, unless she by will disposed of the property otherwise. I am further satisfied that Betts accepted them as the separate property of his wife, and that he did not believe he acquired by the gift the right to the slaves as his own property. I arrive at this conclusion of fact from the following testimony : John B. Walker testifies that on the day after the marriage, Betts told him when he applied to Moses Walker for permission to marry the complainant, that he replied that he was unwilling for him to marry his daughter without knowing her history, which he then gave, and further told him that all the propety he had given or that he intended to give her, would be secured to her separate use and for the use of her children, and if he married her, he must not expect any thing with her by way property, either before or at his, Walker's, death. Betts also stated in the same conversation, that he replied to Walker that he had property enough to support himself and her, and was not influenced to marry her, either from what she had or might have.

C. J. Mills, who was examined on the part of the defendants, testifies that he learned from Betts, in the year 1836, that he, Betts, had procured a copy of the instrument executed by Moses Walker and had consulted counsel as to its validity, and was advised that he could hold the property if he chose. This witness was requested by Betts, in the year 1845, to pursuade the complainant to leave Barbour county and go to Tuskegee and live again with her husband, in answer to which request, the witness stated that it would be in vain to urge her, unless he, Betts, would secure her negroes to her beyond dispute, and Betts replied that it was his intention, and ever had been, that the intentions of Moses Walker should be carried out, and that

Fanny, the daughter of Mrs. Betts by Dr. Nelson, should have the negroes. Betts then pulled out a letter, saying he had written to Col. Betts, of Virginia, for his opinion and advice in reference to this very matter, who had advised him by all means to comply with the intentions of Moses Walker. It is also stated by this witness that in a conversation he had with Betts, a few days after his intermarriage with the complainant, Betts stated that his wife had informed him, before their marriage, that her negroes were secured to her and the heirs of her body, and he then commended her for her good sense in making it known before the marriage. The testimony of the brothers of the complainant fully show that Moses Walker remained under the impression until his death, that the slaves were secured to Mrs. Betts and her children, and there has been no act done by Betts, at least none has been proved, that would go to show that he considered the property in any other view than as the separate property of his wife; for when he became embarrassed and executed conveyances of his property to secure his creditors, he did not attempt to convey or encumber any of the slaves received from Moses Walker.

From this evidence I am induced to believe that Moses Walker, in making the gift and delivering the slaves to Betts, intended that they should be held in accordance with the supposed provisions of the deed, that is, for the separate use of complainant during her life, and after her death for such of her children as should survive her, unless she saw proper to make a disposition of them by will; and I also think that Betts knew the intention of Walker when he received the possession of the slaves and accepted them on these conditions. A trust, therefore, immediately fastened upon the property, according to the intentions of the donor, which it is the duty of a court of equity to enforce.

2. But it is contended that the bill should have been dismissed, even if the proof should show that the slaves are the separate property of the complainant, because it is multifarious, in this, that it seeks to establish the right of the complainant to the slaves as her separate property, and also a divorce from the bonds of matrimony between her and her husband. We admit that the bill was liable to this objection, but the question here is whether this court will dismiss the bill for that reason, after the

court below has decreed upon the merits without taking notice of the question of multifariousness. The complainant took no testimony with the view to establish her right to a divorce. Nothing is said by the chancellor, in his decree, in reference to the divorce, nor is the question of multifariousness (although raised by demurrer contained in the answer) even alluded to. Under such circumstances, we think it but fair to presume that the parties in the court below considered that portion of the bill which seeks a divorce abandoned, and consequently the objection to the bill on that ground abandoned.

The parties have proceeded to a final hearing on one matter alone and no inconvenience has resulted to either of the defendants from the prayer for a divorce. It would, in my judgment, be improper to dismiss in this court for this objection, when in all probability the objection was not urged in the court below. The ground on which the doctrine of multifariousness rests is the inconvenience of mixing up in one bill several distinct matters having no necessary connection with each other, and which may require different proceedings and distinct decrees, (Story's Equity Pl., § 280,) thus embarrassing the court as well as the defendants. But to allow the objection at this time, under the circumstances of this case, instead of being productive of convenience, would be productive of inconvenience, expense and delay, for the same question that has been decided would have to be re-litigated, and the same decree rendered upon the same allegations and proof that should have been rendered if the bill had not contained the prayer for a divorce. Under such circumstances, we will treat the question of multifariousness as it appears to have been treated in the court below, that is, as waived or abandoned.

We come to the conclusion that the slaves named in the pleadings and which were delivered by Moses Walker, the father of complainant, to Elisha Betts, and their increase, are the separate property of the complainant, with the right to dispose of them by will as she may see fit, but if she does not see proper to exercise this power, then at her death they will belong to such of her children as shall survive her. It follows of course that the cotton raised by the slaves is also the separate property of the complainant.

3. But the chancellor clearly erred in decreeing that the horses

and carriage levied on by execution were first subject to pay the amount that Betts was indebted to the complainant; for if we admit that Betts was indebted to her, it is very clear that such indebtedness would not create a specific lien on any of his property; it would only be a general indebtedness and not chargeable upon any specific property. But the executions which were levied on the carriage and horses created on them a lien, which must be prefered, and the bill, so far as it seeks to prevent them from being sold at law, must be dismissed. We must, therefore, reverse the decree of the chancellor and here render such decree as should have been rendered in the court below.

It is therefore ordered, adjudged, and decreed that the slaves named in the pleadings, which were delivered by Moses Walker to Elisha Betts upon his marriage with the complainant, to wit, Jacob, Ann, Dinah, Beck, Louisa, Ishmael, and Jane, the daughter of Beck, are the separate property of the complainant during her life, and at her death will belong to such of her children as shall survive her, unless she shall dispose of them otherwise by will, and therefore are not liable to be sold under execution against her husband; and the cotton levied on, which was raised by the labor of said slaves, is also declared to be the seperate property of the complainant; and the defendants, who caused said slaves and cotton to be taken in execution, are hereby perpetually enjoined from selling the same. But the bill, so far as it seeks to enjoin the sale of the carriage and horses, is hereby dismissed. It is further ordered that the complainant pay the cost of this court, but the defendants must pay the cost in the court below.